482 A.2d 1243 (1984)
In the Matter of E.G., Appellant.
No. 83-719.
District of Columbia Court of Appeals.
Argued May 3, 1984.
Decided October 24, 1984.
*1244 David DeBruin, Public Defender Service, Washington, D.C., with whom James Klein, Public Defender Service, Washington, D.C., was on the briefs for appellant. A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the case was filed, also entered an appearance for appellant.
Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.
Before NEWMAN, Chief Judge, and MACK and BELSON, Associate Judges.
PER CURIAM:
By a juvenile delinquency petition filed on December 31, 1982, appellant was charged with one count of armed robbery (D.C.Code §§ 22-2901, -3202 (1981)). On January 27, 1983, a hearing on appellant's motion to suppress inculpatory statements, tangible evidence and identification testimony was held. After hearing the testimony of the government's witnesses, the trial court denied, relevant to this appeal, appellant's motion.[1] Subsequently, appellant waived his right to trial and stipulated to the facts which had been developed at the hearing on his pretrial motion to suppress. On March 25, 1983, the trial court accepted the stipulation and adjudged appellant guilty of armed robbery.
On appeal, appellant requests that we review those rulings of the trial court's order denying his motion to suppress. In particular, appellant contends (1) the court erred in (a) denying his motion to suppress certain tangible evidence, seized in violation of his fourth amendment rights, and (b) denying his motion to suppress complainant's identification testimony, allegedly resulting from an impermissibly suggestive *1245 pretrial confrontation; and (2) his fifth amendment rights were violated when he was taken into police "custody" and "interrogated" without the benefit of the special procedural safeguards outlined in Miranda v. Arizona, supra note 1.

I
The facts developed at the suppression hearing disclosed the following events. On December 30, 1982, at approximately 8:00 p.m., a young man entered a Holly Farms Restaurant located in Northeast Washington, armed with a shotgun. The assailant directed the manager of the store, Ms. Zina James, to empty the contents of the cash register into a bag and hand the bag to him. Ms. James did as ordered and the robber fled. Ms. James immediately reported the robbery to the police and described the assailant as an 18 or 19 year old black male, of medium build, with a light brown complexion, carrying a shotgun, wearing a beige hat, dark sunglasses, beige coat, dark pants and combat boots. The police dispatcher broadcast a lookout of the suspect based on this description.
Lieutenant Wells of the Metropolitan Police Department heard the broadcast at approximately 8:15 p.m. Thereafter, three or four blocks from the scene, Wells saw appellant running in a general direction away from the restaurant. Upon observing that appellant was a young black male wearing a beige jacket and combat boots, Wells ordered appellant to halt. Appellant continued to run until the lieutenant issued a second order for him to stop. Wells approached appellant with his service revolver drawn and ordered appellant to place his hands on the roof of his police cruiser. Wells proceeded to frisk appellant for weapons, but found none. While frisking the pockets of appellant's jacket, however, Wells felt a "big soft lump" stuffed down one of them. Although the lump did not feel like a weapon, Wells reached into the pocket and discovered a beige hat. In appellant's other pocket, Wells once again felt another object which did not feel like a weapon. Nonetheless, he reached into the pocket and removed a pair of sunglasses. Upon finding the sunglasses and hat, Wells stated aloud: "Here is the sunglasses and the hat. I wonder where the gun and money is." In response to Wells' statement, appellant answered "I gave it to my partner." At the time appellant responded to Wells' statement, no other officer was present and appellant had not been advised of his Miranda rights. Shortly thereafter another police officer arrived on the scene and advised appellant of his right to remain silent. The officers then transported appellant to the crime scene for identification purposes. The complainant made her identification from inside the restaurant while appellant stood near a window outside the restaurant. Initially, she did not believe appellant to be the robber; but when Wells told another officer to place the hat and glasses on appellant, the complainant positively identified him.
At appellant's pretrial motion to suppress the tangible evidence, identification testimony, and appellant's inculpatory response to Wells' statement, the trial judge ruled that (1) the search and seizure of the hat and glasses by Wells was permissible because probable cause for appellant's arrest existed at the time of the stop; (2) the identification procedure in which the complainant identified appellant did not produce an unreliable identification; and (3) appellant's statement "I gave it to my partner" was a spontaneous one and not the product of a Miranda interrogation.
Taking account of the facts as found by the trial judge and the inferences reasonably to be drawn from those facts, we are in agreement with the conclusions reached by him regarding the tangible evidence and the identification testimony. We do not, however, concur in the trial judge's decision denying appellant's motion to suppress the statement obtained from appellant by Wells' inquiry concerning the money and the gun. Consequently, we reverse appellant's adjudication of delinquency.

*1246 II
At the suppression hearing, trial counsel for appellant argued, and government counsel conceded, that the search of appellant can be justified only if Wells had probable cause to arrest appellant at the time of the stop.[2] Accepting the government's concession, the question then is whether there was probable cause for the arrest of appellant under the circumstances described. For reasons which follow, we hold that there was such probable cause.[3]
Although "[t]here is no fixed formula for determining the existence of probable cause," Smith v. United States, 435 A.2d 1066, 1068 (D.C.1981), cert. denied, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982) (citation omitted), it has repeatedly been held to exist "where `the facts and circumstances within [the officer's] knowledge, and of which [he] had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). As the Supreme Court explained in Brinegar, supra:
These long-prevailing standards [for the determination of guilt] seek to safeguard citizens from rash and unreasonable interference with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law abiding citizens at the mercy of the officer's whim or caprice.
Id. 338 U.S. at 176, 69 S.Ct. at 1311. Accordingly, a finding of probable cause depends on the "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. at 175, 69 S.Ct. at 1310. "Reasonable probability from the facts and circumstances at the time and place is all that is required `not certainties and not necessarily eventual truth.'" Franklin v. United States, 204 A.2d 341, 343 (D.C.1964) (quoting Bell v. United States, 102 U.S.App.D.C. 383, 387, 254 F.2d 82, 86, cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958)).
Under the circumstances here presented, the proffered grounds for probable cause were sufficient to narrow the number of suspects to a level tolerable under the fourth amendment. When Lieutenant Wells searched appellant, he was apprised of the following facts: (1) an armed robbery had occurred only minutes before; (2) the scene of the crime was just *1247 three or four blocks from where he saw appellant running; (3) appellant had been running in the general direction away from the crime scene; (4) the crime had been committed by a young black male carrying a shotgun, wearing sunglasses, a beige hat and coat, dark pants and combat boots; (5) appellant's appearance reasonably conformed to the basic elements of the complainant's description; and (6) appellant had refused to stop when initially ordered to do so.[4] Recognizing the fact that we are dealing with "probabilities deduced from a set of circumstances taken in combination, not singly," Heard v. United States, 197 A.2d 850, 851 (D.C.1964), we think that a reasonable, cautious and prudent police officer was justified in apprehending appellant. We concede that the case is a close one, but the strong correlation between appellant's appearance and the description possessed by Lieutenant Wells, together with appellant's proximity to the crime scene and his behavior when confronted with a police order to halt, tips the scales here in favor of probable cause. See Ellis v. United States, 105 U.S.App.D.C. 86, 264 F.2d 372, cert. denied, 359 U.S. 998, 79 S.Ct. 1129, 3 L.Ed.2d 986 (1959); Heard v. United States, supra.
Because probable cause existed for the arrest of appellant at the time Lieutenant Wells apprehended him, the search incident thereto was valid, United States v. Robinson, 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973) and appellant's motion to suppress the hat and sunglasses was properly denied.[5]

III
Appellant's final contention relates to the trial judge's denial of his motion to suppress his response to Lieutenant Wells' rhetorical inquiry concerning the money and the gun. The trial judge ruled that appellant's statement was not the result of interrogation and therefore not within the Miranda protections. We disagree.
The core of the Supreme Court's holding in Miranda v. Arizona, supra was that:
the prosecution may not use statements, whether exculpatory on inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.
Id. 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted). Although the trial court did not determine whether appellant was in "custody" at the time the incriminating statement was made, the issue is uncontested on appeal. Appellant had been stopped at gunpoint by Lieutenant Wells, directed against the officer's squad car and ordered to place his hands on the roof. The evidence is undisputed that appellant *1248 was "deprived of his freedom of action in [a] significant way." Id.
The Miranda warnings, however, "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); see Miranda, supra, 384 U.S. at 478, 86 S.Ct. at 1629. Because it is uncontested that appellant was "in custody" and not read his Miranda rights at the time of his exchange with Lieutenant Wells, the only remaining question is whether that exchange constituted "interrogation."
It seems plain that appellant's incriminating statement was the result of interrogation as conceptualized in the Miranda opinion. In Innis, supra, the Court concluded:
that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Id. 446 U.S. at 300-301, 100 S.Ct. at 1689-1690 (footnotes omitted; emphasis added). Although Lieutenant Wells' statement does not satisfy the first prong of the definition of "interrogation" (i.e. it was not an express question), it clearly was the "functional equivalent" of questioning. In short, it can be said without reservation that Lieutenant Wells should have known that his statement was reasonably likely to elicit an incriminating response from the appellant.
Unlike the situation in Innis, where the challenged comments were "at least in form, nothing more than a dialogue between [] two officers to which no response from the [defendant] was invited" id. at 302, 100 S.Ct. at 1690 (emphasis added), here, no other person was present when Lieutenant Wells asked, aloud, "I wonder where the gun and the money is." See United States v. Alexander, 428 A.2d 42, 51 (D.C.), reh'g denied, 441 A.2d 936 (1981). Unlike Innis, there was no understandable explanation for Lieutenant Wells' rhetorical question other than to elicit a response from appellant. It is precisely this type of tactic,[6] following on the heels of a statement confronting the suspect with purported tangible evidence of a crime, which is prohibited by Miranda.
Reversed.
NOTES
[1] The trial court did grant appellant's motion with respect to three statements made by him after he had been advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court ruled that appellant had never indicated that he was willing to answer questions or that he was willing to do so without having an attorney present. The government did not appeal these rulings.
[2] Because the scope of Wells' search exceeded a permissible frisk for weapons, his seizure of the hat and glasses cannot be justified under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See id. at 24, 88 S.Ct. at 1881. See also Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); Sibron v. New York, 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); United States v. Boswell, 347 A.2d 270, 276 (D.C.1975).
[3] We do not regard the question of when the arrest occurred as controlling this aspect of our decision, since it is well-established that "[e]ven if the formal arrest was not made until after the search, the search will be upheld so long as there is probable cause for an arrest before the search is begun." Bailey v. United States, 128 U.S.App.D.C. 354, 357, 389 F.2d 305, 308 (1967) (citing United States v. Gorman, 355 F.2d 151, 159-60 (2d Cir.1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966)). Conversely, the moment a valid arrest of appellant was accomplished is one of the determining factors in our holding with respect to appellant's motion to suppress his inculpatory statement. See infra.
[4] Appellant's disregard for Lieutenant Wells' initial order to halt is entitled to special weight because from this fact, when coupled with what he already knew, Lieutenant Wells could reasonably infer appellant was hastily fleeing a crime.
[5] Appellant also maintained at the pretrial suppression hearing that complainant's identification testimony should be suppressed because such evidence was the result of an impermissibly suggestive show-up. Relying on Manson v. Braithwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the trial judge ruled that the identification was admissible. After having weighed "the corrupting effect of the suggestive identification itself" against the "indicators of [the complainant's] ability to make an accurate identification," id. at 114, 116, 97 S.Ct. at 2253, 2254, we cannot say we disagree. Our review of the record reveals that the evidence of the complainant's ability to make a reliable identification clearly outweighs the evidence of suggestiveness and that, under all the circumstances of this case, there was not "a very substantial likelihood of irreparable misidentification.'" Id. at 116, 97 S.Ct. at 2254 (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). Consequently, we hold that the trial judge properly rejected appellant's motion for suppression of the challenged identification.
[6] Wells testified that he did not expect a response to his statement. Even if this testimony were credited, the government is in no better position. Innis makes clear that the definition of interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." 406 U.S. at 301, 100 S.Ct. at 1690. Moreover, it is difficult to conclude that Wells should not have known that his statement was "reasonably likely" to elicit a response; at the time appellant (then 14 years old) was being held at gun point against the police cruiser with his hands on the roof.